# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
SOUTHEAST CONFERENCE, et al.,

        Plaintiffs,

            v.                          Civil Action No.  08-1598 (JDB)

THOMAS VILSACK, Secretary,
United States Department of Agriculture,
et al.,

        Defendants.
```

## MEMORANDUM OPINION

In 2008, the United States Forest Service approved the 2008 Tongass National Forest Land and Resource Management Plan Amendment ("2008 TLMP Amendment" or "Plan"). The Plan established the Forest Service's goals and objectives for the management of the Tongass National Forest in Alaska, which include promoting the ecological, social, and economic values derived from the Tongass. Plaintiffs -- several Alaskan cities and regional, non-profit corporations -- disagree with the Forest Service's vision for the Tongass, particularly as it addresses the timber harvest. Accordingly, they challenge several components of the 2008 TLMP Amendment, positing that it improperly reduces the amount of land available in the Tongass for the timber harvest. Before the Court are the parties' cross-motions for summary judgment, on which the Court heard oral argument on January 14, 2010. Upon consideration of the applicable law, the parties' several memoranda, and the entire record herein, and for the reasons stated below, the Court will grant defendants' motion and deny plaintiffs' motion.[1]

---

[1] Although plaintiffs name several different individuals and entities as defendants, the Court will refer only to the Forest Service because it promulgated the 2008 TLMP Amendment.

## I.

Located in Southeast Alaska, the 16.8 million acre Tongass National Forest is the nation's largest national forest. "Most of the area of the Tongass is wild and undeveloped." Administrative Record, 2008 TLMP Amendment Final Environmental Impact Statement ("2008 TLMP Amendment FEIS"), 1-3. In spite of -- or perhaps because of -- this feral environment, "[t]he economies of Southeast Alaska's communities rely on the Tongass National Forest to provide natural resources for uses such as fishing, timber harvesting, recreating, tourism, mining, and subsistence." Id. Hence, "[m]aintaining the abundant natural resources of the Forest, while providing opportunities for their use, is a major concern of Southeast Alaska residents." Id. The Forest Service manages the Tongass with these issues in mind.

## A.

The National Forest Management Act of 1976, 16 U.S.C. § 1600 et seq., requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest systems." 16 U.S.C. § 1604(a). In doing so, the Forest Service must "balance competing demands on national forests, including timber harvesting, recreational use, and environmental preservation." Lands Council v. Powell, 395 F.3d 1019, 1025 n.2 (9th Cir. 2005); see also 16 U.S.C. § 528 (national forests "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes"). Indeed, "[u]nlike other types of federal conservation statutes, the law regulating the use of national forests embraces the concepts of 'multiple use' and 'sustained yield of products and services.'" Lands Council, 395 F.3d at 1025 n.2 (quoting 16 U.S.C. § 1607). As part of its management of national forests, the Forest Service must "revise[] from time to time [its forest plans] when the Secretary [of

Agriculture] finds conditions in a unit have significantly changed, but at least every fifteen years."  16 U.S.C. § 1604(f)(5).

In addition to the statutory scheme governing national forests generally, several other statutes specifically regulate the Tongass.  First, the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. No. 96-487, 94 Stat. 2371 (Dec. 2, 1980), created numerous new federal properties in Alaska in order to maintain a "proper balance between the reservation of" land for conservation and the disposition of "those public lands necessary and appropriate for more intensive use."  16 U.S.C. § 3101(d).  Because Congress believed that ANILCA properly balanced these outcomes, it concluded that "the need for future legislation . . . has been obviated" by the statute.  Id.  Congress therefore prohibited "future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska[, unless] notice is provided in the Federal Register and to both Houses of Congress."  Id. § 3213(a).  The Forest Service must terminate any such withdrawal "unless Congress passes a joint resolution of approval within one year after the notice of such withdrawal has been submitted to Congress."  Id.

Second, the Tongass Timber Reform Act ("TTRA"), Pub. L. No. 101-626, 104 Stat. 4426 (Nov. 28, 1990), "imposed additional planning requirements for the Tongass."  Natural Res. Def. Council v. United States Forest Serv., 421 F.3d 797, 801 (9th Cir. 2005).  "Among these requirements, Congress imposed a unique duty on the Forest Service to consider the 'market demand' for timber" when creating a forest plan for the Tongass.  Id.  This duty requires the Secretary of Agriculture,

to the extent consistent with providing for the multiple use and sustained yield of

-3-

all renewable forest resources, [to] seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle.

16 U.S.C. § 539d(a).  Although the statute's language is merely "hortatory," it nevertheless requires the "Forest Service . . . [to] at least <u>consider</u> market demand and <u>seek</u> to meet market demand."  <u>Natural Res. Def. Council</u>, 421 F.3d at 809.  The TTRA envisions "not an inflexible harvest level, but a balancing of the market, the law, and other uses including preservation." <u>Alaska Wilderness Recreation & Tourism Ass'n v. Morrison</u>, 67 F.3d 723, 731 (9th Cir. 1995).

**B.**

The Forest Service promulgated and approved the 2008 TLMP Amendment to fulfill its statutory responsibilities for the Tongass.  In the Plan, as in the four previous Tongass forest plans, the Forest Service sought to meet its obligation to "provide for multiple use and sustained yield of the products and services obtained from the National Forest System."  Administrative Record, 2008 TLMP Amendment Record of Decision ("2008 TLMP Amendment ROD"), 2 (internal quotation marks omitted).  In other words, the 2008 TLMP Amendment balanced "the many competing uses to which land can be put."  <u>Id.</u>  Of particular concern to plaintiffs here is how the Forest Service balanced the needs of the timber industry with the other uses of the Tongass.  Accordingly, the Court will focus on those components of the 2008 TLMP Amendment that are relevant to that issue.

The 2008 TLMP Amendment sets forth the Forest Service's vision for how the 16.8 million acres of the Tongass will be managed.  To do so, the Forest Service uses land management planning, which "may be compared to city, county, or borough zoning.  Just as areas

in a community are zoned as commercial, industrial, or residential, the forest is also zoned to

allow, or not allow, various uses and activities."  2008 TLMP Amendment FEIS at 2-1.  Forest

plan "zoning" is accomplished by employing land use designations, which "specify ways of

managing an area of land and the resources it contains."  Id.  For example, land may be

designated to protect certain resources, such as old growth wildlife habitats, or it may be

designated to permit the harvest of resources, such as timber or minerals.  See id.  In addition,

lands may be designated to permit a combination of activities on the land, "such as providing for

scenic quality in combination with timber harvesting."  Id.  As relevant here, in the 2008 TLMP

Amendment the Forest Service designated 1.22 million acres of the Tongass as "old growth

reserves," with the result that timber harvesting is prohibited on these lands.  See 2008 TLMP

Amendment ROD at 5.  The Forest Service also has designated approximately 2.3 million acres

of the Tongass for timber production, of which 663,000 acres are available for the timber harvest

while the 2008 TLMP Amendment remains in effect.  See id. at 5-6.

The 2008 TLMP Amendment also includes the Forest Service's projection of market

demand for timber from the Tongass.  A Tongass forest plan must include a projection of market

demand for timber so the Forest Service can fulfill its statutory obligation under the TTRA to

seek to meet market demand.  To reach a projection of demand, and to assess whether the Plan

would supply enough timber to satisfy that demand, the Forest Service primarily relied on a

forecast of market demand prepared by the Pacific Northwest Research Station.  See 2008 TLMP

Amendment ROD at 31-35 (discussing Allen M. Brackley, et al., Timber Products Output and

Timber Harvests in Alaska: Projections for 2005-2025 (2006)).  The study "project[ed] the

demand for timber from the Tongass, [which was] derived from the demand in Pacific Rim

markets for the end products manufactured from that timber." Id. at 31. It gave four different scenarios of timber demand -- limited lumber, expanded lumber, medium integrated, and high integrated -- projecting a range of future average demand for Tongass timber. See id. The scenarios represent a spectrum of market demand, with "limited lumber" projecting the lowest levels of market demand and "high integrated" projecting the highest levels of market demand. Id. Under the scenario deemed most likely -- "expanded lumber" -- market demand is projected to range from 61.9 million board feet in 2007 to 187.1 million board feet in 2022, the end of the planning cycle for the 2008 TLMP Amendment. See id. at 33. The Forest Service adopted the expanded lumber scenario as the measure of market demand in its Tongass forest plan. See id. at 35.[2]

Based on the demand scenario it adopted, the Forest Service approved a Tongass forest plan that set the allowable sale quantity of timber for the next ten years at 2.67 billion board feet, or an average of 267 million board feet annually. See id. The allowable sale quantity "represents the upper decadal limit on the amount of timber that may be offered for sale from suitable timberland in the Tongass National Forest as part of the regularly scheduled timber sale program." Nat. Res. Def. Council, 421 F.3d at 802 n.10 (internal quotation marks omitted). The Forest Service determined that an allowable sale quantity of 267 million board feet annually not only would satisfy projected market demand, but also would ensure that the Forest Service could

---

[2] Plaintiffs do not challenge the Forest Service's reliance on the Pacific Northwest Research Station's report, or the Forest Service's selection of the expanded lumber scenario as the correct projection of market demand.

meet unforeseen or changing market conditions.[3]

One such changing market condition the Forest Service considered was the development of an integrated timber industry.  It concluded that the 2008 TLMP Amendment should be flexible enough to provide sufficient timber to create an "integrated timber industry" in Southeast Alaska.  See 2008 TLMP Amendment ROD at 35.  An integrated industry "is one that includes processing facilities and markets for all types of logs from timber harvest operations conducted in the area, and for byproducts such as chips that result from processing those logs into lumber or other products."  Id.  Although such an industry does not currently exist in Southeast Alaska, the Forest Service "consider[ed] it important to provide an opportunity for the timber industry to become more integrated."  Id. at 36.  Relying on the Pacific Northwest Research Station's study, the Forest Service concluded that "a reliable annual supply of at least 200 million board feet of economic timber would be needed from the Tongass to meet the objective of providing an opportunity for the reestablishment of an integrated industry."  Id. at 37.  An allowable sale quantity of timber of 267 million board feet annually permitted this opportunity.  See id. ("none of the alternatives with an [allowable sale quantity] lower than the amended Forest Plan's meet [the] criterion" of providing enough timber to supply a potentially integrated industry).

Finally, to guide the timber harvest in the Tongass and to protect environmentally sensitive areas, the Forest Service implemented what it termed the Timber Sale Program Adaptive Management Strategy.  See id. at 64 ("The Strategy is an extra step the Forest Service is

---

[3] Plaintiffs do not challenge the Forest Service's selection of 2.67 billion board feet as the allowable sale quantity over the next decade, or the conclusion that 267 million board feet annually is sufficient to both meet projected market demand and provide enough timber to meet changing market conditions.

taking to respond to recommendations from many parties that we avoid timber harvest and road construction in areas of the Tongass that are perceived as being more environmentally sensitive . . . . ").  Under the Strategy, the "timber harvest will be allowed in three phases as a means of limiting timber harvest and associated road construction activities to lower quality roadless areas until the level of timber harvest warrants allowing such activities in higher quality roadless areas."  Id. at 8.  The parts of the forest available to the timber harvest under the 2008 TLMP Amendment are divided into four separate areas: roaded, lower value roadless areas, moderate value roadless areas, and higher value roadless areas.  Id.  Based on these divisions, timber harvest and associated road construction is allowed in these areas in three phases, which come into effect if necessary to meet market demand.  Id. at 65-66.  Phase one includes roaded areas and most of the lower value roadless areas; phase two includes phase one lands and most of the moderate value roadless areas; and phase three includes the entire land base suitable for the timber harvest.  Id.  The Timber Sale Adaptive Management Strategy limits the timber harvest to phase one areas until timber harvest levels reach at least 100 million board feet per year for two consecutive years.  Id. at 65.  If that threshold is met, phase two lands become available for the timber harvest.  Id. at 66.  If the harvest levels reach at least 150 million board feet per year for two consecutive years, phase three lands become available for the timber harvest.  Id.

### C.

Plaintiffs bring suit under the Administrative Procedure Act, seeking declaratory and injunctive relief on the grounds that the 2008 TLMP Amendment violates ANILCA and the TTRA.  In their complaint, plaintiffs challenge three components of the Plan.  First, they contend that the "old growth reserves" land use designation, which in their view withdraws more than

5,000 acres from the timber harvest, violates ANILCA's provision prohibiting such executive branch withdrawals.  See Compl. at p. 23.  They opine that because the Forest Service neither sent notice of the designations to both houses of Congress nor obtained a joint congressional resolution authorizing the designations, the "old growth reserves" designations are illegal under ANILCA.

Second, plaintiffs argue that the Timber Sale Adaptive Management Strategy "withdraws so much of the commercial forest land base as to effectively destroy the Forest Service's ability to exercise its discretion to meet market demand for an integrated timber industry."  Compl. ¶ 4.  In other words, plaintiffs posit that the Strategy "ha[s] rendered it improbable that Defendants could" fulfill their obligation under the TTRA to seek "to meet market demand for an integrated timber industry."  Compl. ¶ 51.

Third, plaintiffs suggest that the 2008 TLMP Amendment imposes "non-statutory" constraints on the Forest Service's "mandatory obligation under TTRA to seek to meet market demand."  Pls.' Mem. in Supp. of Mot. for Partial Summ. J. ("Pls.' Mem.") [Docket Entry 16], at 38.  That is, plaintiffs insist that certain elements of the Plan, including the Timber Sale Adaptive Management Strategy, limit the Forest Service's ability to seek to meet the market demand for an integrated timber industry.  See Pls.' Reply in Supp. of Mot. for Partial Summ. J. ("Pls.' Reply") [Docket Entry 18], at 40, 41.[4]

---

[4] In their complaint, plaintiffs also argue that the 2008 TLMP Amendment has "effectively repealed . . . [the National Forest Management Act]."  Compl. ¶ 51.  But in response to the Court's question regarding what claims plaintiffs were asserting in this action, plaintiffs' counsel did not include the claim based on the National Forest Management Act.  Moreover, the single statement that the 2008 TLMP Amendment "effectively repealed" the National Forest Management Act is insufficient to state a claim, especially where plaintiffs have not even identified the provisions of the Act at issue.

## II.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record.  See Prof'l Drivers Council v. Bur. of Motor Carrier Safety, 706 F.2d 1216, 1229 (D.C. Cir. 1983); Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  The agency resolves factual issues in a manner that is supported by the administrative record. Summary judgment is then the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); Sw. Merchandising Corp. v. Nat. Labor Relations Bd., 53 F.3d 1334, 1341 (D.C. Cir. 1995); Richard v. Immigration & Naturalization Serv., 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, id. § 706(2)(C), or "without observance of procedures required by law," id. § 706(2)(D).  The scope of review, however, is narrow.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  It presumes the agency's action is valid.  See Volpe, 401 U.S. at 415.  And the "court is not to substitute its judgment for that of the agency."  State Farm, 463 U.S. at 43.  Moreover,

where an agency "is evaluating scientific data within its technical expertise," the Court must give the agency "an extreme degree of deference."  Am. Farm Bureau Fed'n v. Envtl. Prot. Agency, 559 F.3d 512, 519 (D.C. Cir. 2009) (internal quotation marks omitted); see also Am. Radio Relay League, Inc. v. Fed. Commc'n Comm'n, 524 F.3d 227, 233 (D.C. Cir. 2008) ("Where a 'highly technical question' is involved, 'courts necessarily must show considerable deference to an agency's expertise.'" (quoting MCI Cellular Tel. Co. v. Fed. Commc'n Comm'n, 738 F.2d 1322, 1333 (D.C. Cir. 1984))).  But the court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting State Farm, 463 U.S. at 43).

### III.

Plaintiffs contend that the "old growth reserves" land use designation in the 2008 TLMP Amendment violates 16 U.S.C. § 3213(a), ANILCA's provision prohibiting executive branch withdrawals.  According to plaintiffs, the "old growth reserves" designation has the effect of closing the designated land to the timber harvest.  See Pls.' Mem. at 20; Pls.' Reply at 2.  And because this land is closed to the timber harvest, plaintiffs posit that the "old growth reserves" designation "withdraws" land within the meaning of 16 U.S.C. § 3213(a).  Hence, in plaintiffs' view, the "old growth reserves" designation can be upheld only if the Forest Service notifies Congress and seeks a joint resolution approving the designation.  The Forest Service has not done so, and therefore plaintiffs contend that the 2008 TLMP Amendment is not "in accordance with law."  Pls.' Mem. at 25.

Although plaintiffs' argument rests on the assumption that the statutory definition of a withdrawal encompasses land use designations, plaintiffs never define the term "withdrawal." Nor, to be fair, does ANILCA.  In the absence of a definition of the term in ANILCA, the Court must look to how other, related statutes define withdrawal, see, e.g., Arlington Cent. School Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 300-03 (2006); Pierce v. Underwood, 487 U.S. 552, 564-65 (1988), as well as to the context in which the term is used in the statute at issue, see, e.g., Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995); United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988).

One such related statute is the Federal Land Policy and Management Act, which, like ANILCA, governs the management of certain federal lands.  Under that statute, a withdrawal is statutorily defined as a "withholding [of] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program."  43 U.S.C. § 1702(j).  Interpreting that provision, the D.C. Circuit described a withdrawal as an action that "exempts the covered land from the operation of public land laws."  New Mexico v. Watkins, 969 F.2d 1122, 1124 (D.C. Cir. 1992); see also Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 761 n.1 (9th Cir. 1986) ("A withdrawal withholds an area of federal land from sale, lease or use under the general land laws . . . in order to preserve a public value in the area or for a public purpose.").  Public, or general, land laws "authorize the transfer of federal lands to the private domain."  Sagebrush Rebellion, 790 F.2d at 761 n.1.  Putting the definitions together, then, a withdrawal exempts covered land from the

operation of laws that otherwise authorize the transfer of federal lands to the private domain for private use.

This definition accords with the way several other provisions of ANILCA use the term withdrawal.  For example, in a provision discussing ANILCA's effect on withdrawals of land made prior to ANILCA's passage, Congress stated that withdrawn lands "shall not be deemed available for selection, appropriation, or disposition."  16 U.S.C. § 3209(a).  The phrase "selection, appropriation, or disposition" echoes the phrase "settlement, sale, location, or entry" used in the Federal Land Policy and Management Act's definition of withdrawal.  Furthermore, in an ANILCA provision regarding mineral leasing rights, Congress found that certain lands "are . . . withdrawn from all forms of appropriation or disposal under public land laws."  16 U.S.C. § 410hh-5.  This construction mirrors the D.C. Circuit's description that a withdrawal under the Federal Land Policy and Management Act "exempts the covered land from the operation of public land laws."  Watkins, 969 F.2d at 1124.[5]  The statutory evidence, then, supports the application of the Federal Land Policy and Management Act's definition of withdrawal to ANILCA.[6]

_____

[5] The Federal Land Policy and Management Act's definition of withdrawal also reflects the general use of the term in public land jurisprudence: "A withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws."  So. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 784 (10th Cir. 2005) (citing Charles F. Wheatley, Jr., II Study of Withdrawals and Reservations of Public Domain Lands A-1 (1969)). "Just as Congress . . . can pass laws opening the public lands to private settlement, so also it can remove the public lands from the operation of those same laws.  That is what a withdrawal does." Id.

[6] It is reasonable to believe that Congress wrote ANICLA with the Federal Land Policy and Management Act's definition of withdrawal in mind given that Congress passed the Federal Land Policy and Management Act just four years before ANILCA.  Compare Federal Land Policy and Management Act, Pub. L. No. 94-579, 90 Stat. 2743 (Oct. 21, 1976), with ANILCA,

Because other provisions of ANILCA reflect the definition of withdrawal set forth in the Federal Land Policy and Management Act, the Court is persuaded that the term withdrawal in 16 U.S.C. § 3213(a) should be given that definition as well.  See United Savings Ass'n of Texas, 484 U.S. at 371 ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").  Accordingly, for "old growth reserve" land use designations to be withdrawals, they must "exempt[] the covered land from the operation of public land laws."  Watkins, 969 F.2d at 1124.  But plaintiffs make no allegations that the designations here have the effect of suspending any public lands laws.  Nor could they.

Land use designations -- which are part of nearly every forest plan[7] -- are merely examples of the Forest Service's statutory responsibility under the National Forest Management Act to "provide for multiple use and sustained yield of the products and services of units of the National Forest System."  16 U.S.C. § 1604(e).  They neither exempt lands from the operation of public land laws, nor suspend the operation of those laws on certain lands.  Land use designations simply have no effect on laws that authorize the transfer of federal lands to the private domain -- and plaintiffs have not pointed this Court to any authority suggesting otherwise.  Indeed, the only court to consider plaintiffs' contention that land use designations are withdrawals summarily rejected it.  See Seattle Audubon Society v. Lyons, 871 F. Supp. 1291, 1315 (W.D. Wash. 1994).  Considering a challenge under the Federal Land Policy and Management Act, the Lyons court held that employing land use designations was "merely an

_____

Pub. L. No. 96-487, 94 Stat. 2371 (Dec. 2, 1980).

[7] See, e.g., Lands Council, 395 F.3d at 1033 (discussing land use designations); Morrison, 67 F.3d at 726 (same).

exercise of the Secretary's multiple-use planning responsibilities," and thus could not be a withdrawal.  Id.  So too here.

The Forest Service's responsibility under the National Forest Management Act to plan for multiple uses necessarily means that not all lands are available for all purposes.  See, e.g., 16 U.S.C. § 1604(g)(3)(E) (Forest Service must ensure that timber will be harvested from National Forest System lands only where, for example, "(i) soil, slope, or other watershed conditions will not be irreversibly damaged"); id. § 1604(k) ("In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible . . . .").  To accept plaintiffs' argument that land use designations are withdrawals would be to assume that Congress implicitly repealed this "multiple use" approach, arrogating power to promulgate forest plans.  The Court finds no reason to read ANILCA so broadly when its plain language and context support a more measured construction.  That construction, the Court notes, accords with the fact that "Congress has given no indication as to the weight to be assigned each value and it must be assumed that the decision as to the proper mix of uses within any particular area is left to the sound discretion and expertise of the Forest Service."  Sierra Club v. Hardin, 325 F. Supp. 99, 123 (D. Alaska 1971); accord Mountain States Legal Found. v. Glickman, 922 F. Supp. 628, 634 (D.D.C. 1995) ("District courts have also held that the Forest Service has wide discretion to weigh and decide the proper uses within any area of the National Forests."), aff'd, 92 F.3d 1228 (D.C. Cir. 1996).  Accordingly, the land use designations of "old

growth reserves" in the 2008 TLMP Amendment are not withdrawals under 16 U.S.C. § 3213(a).[8]

Nevertheless, plaintiffs suggest that the Court need not be guided only by the statutory definition of withdrawal. Instead, according to plaintiffs, the "realities of the situation" should inform the Court's analysis -- and because the "old growth reserves" are closed to the timber harvest, they must, as a practical matter, be withdrawals under 16 U.S.C. § 3213(a). For this argument, plaintiffs rely on Mountain States Legal Found. v. Andrus, 499 F. Supp. 383 (D. Wyo. 1980). At issue there was whether the Secretary of the Interior's failure to act on applications for mineral leases that had been pending before him for several years was a withdrawal under the Federal Land Policy and Management Act. See Mountain States, 499 F. Supp at 393, 396. The court concluded that the Secretary's delay in acting on the lease applications precluded plaintiffs from ever perfecting a potential property right under federal law. See id. at 397. The delay had the effect of preventing plaintiffs from exercising their right to seek mineral leases on federal land under the public land laws. See id. In the court's view, "the realities of the situation" meant that delay was tantamount to a prohibition of private action on certain federal land. See id.

The Mountain States decision cannot bear the weight plaintiffs assign to it. To begin with, the Ninth Circuit rejected the decision's reasoning as unpersuasive. See Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1230-31 (9th Cir. 1988) ("Mountain States is not binding on

_____

[8] Plaintiffs also suggest that areas of the Tongass identified as Timber Sale Adaptive Management Strategy phase two and phase three lands are withdrawals under 16 U.S.C. § 3213(a). Compl. ¶ 57; see also Pls.' Reply at 15. But these lands are not closed even to the timber harvest -- the Timber Sale Adaptive Management Strategy merely indicates at what point these lands may be harvested. And, in any event, the Strategy, as with the "old growth reserves," does not purport to suspend any public land laws. Plaintiffs do not contend otherwise.

us and we do not find its reasoning persuasive.").  Plaintiffs suggest that this Court should

nevertheless follow Mountain States and imbue the statutory definition of withdrawal with a

practical component.  This Court does not read the case so broadly.  Mountain States merely

applied the Federal Land Policy and Management Act's definition of withdrawal -- the Secretary's

delay was a withdrawal because it had the effect of suspending the operation of public land laws

that granted private individuals the right to apply for mineral leases on public lands.  Id. at 396-

97.  It spoke of the "realities of the situation" only because there was no executive branch action

that affirmatively suspended the public land laws.  The court did not, therefore, create an

alternative, more practical definition of withdrawal.  Accordingly, Mountain States is inapposite

to plaintiffs' ANILCA challenge.

## IV.

Plaintiffs next assert that the 2008 TLMP Amendment violates the TTRA because the

Timber Sale Adaptive Management Strategy "withdraws so much of the commercial forest land

base as to effectively destroy the Forest Service's ability to exercise its discretion to meet market

demand for an integrated timber industry."  Compl. ¶ 4 (emphasis added).  That is, plaintiffs

believe that the Strategy "ha[s] rendered it improbable that Defendants could" fulfill their

obligation under the TTRA to seek "to meet market demand for an integrated timber industry."

Compl. ¶ 51.  This challenge, however, proceeds from the erroneous premise that the TTRA

obligates the Forest Service to seek to meet the market demand for an integrated timber industry.

In fact, the TTRA only instructs the Forest Service to "seek to provide a supply of timber from

the Tongass National Forest which (1) meets the annual market demand for timber from such

forest and (2) meets the market demand from such forest for each planning cycle."  16 U.S.C. §

539d(a); see also Natural Res. Def. Council, 421 F.3d at 809 (Forest Service attempted to meet market demand by "using its own economists' projections of the annual and plan-cycle market demand for Tongass timber").  The TTRA says nothing at all about an integrated timber industry.

The Forest Service has discretion to make predictions of market demand.  Accordingly, the Forest Service could project market demand based on the needs of an integrated timber industry.  In that case, the TTRA might indeed oblige the Forest Service to seek to meet market demand for an integrated timber industry.  But in the 2008 TLMP Amendment, the Forest Service chose a projection of market demand that was not based on an integrated timber industry -- which in fact does not currently exist in the Tongass.  See 2008 TLMP Amendment ROD at 31-35.  It explicitly rejected two projections that were based on an integrated timber industry, and explained why it was doing so.  See id.  Therefore, the Forest Service is not obligated under the TTRA to seek to meet the market demand of an integrated timber industry in the 2008 TLMP Amendment.

Nevertheless, plaintiffs repeatedly, and consistently, contend that the 2008 TLMP Amendment and its Timber Sale Adaptive Management Strategy prevent the Forest Service from seeking to meet market demand for an integrated timber industry.  See, e.g., Compl. ¶ 3 (the 2008 TLMP Amendment "effectively eliminat[es] the Forest Service's ability to exercise its discretion to meet annual and cyclical market demand . . . by providing three years volume of economic timber under contract to an integrated timber industry"); Compl. ¶ 4 (the Timber Sale Adaptive Management Strategy "withdraws so much of the commercial forest land base as to effectively destroy the Forest Service's ability to exercise its discretion to meet market demand for an integrated timber industry"); Compl. ¶ 49 ("Because the Defendants have never properly

evaluated or determined the volume of timber and the [allowable sale quanity] to provide three years of economic timber under contract to an integrated industry, it follows that [the Strategy] is . . . arbitrary and capricious . . . ."); Compl. ¶ 51 (the 2008 TLMP Amendment "ha[s] rendered it improbable that Defendants could exercise their discretion to provide sufficient economic timber to meet market demand for an integrated timber industry").[9] Maybe so, but plaintiffs' claim simply misses the mark.

Plaintiffs' challenge seeks to hold the Forest Service to a standard it is not required to fulfill.  Whether or not the Timber Sale Adaptive Management Strategy will prevent the Forest Service from seeking to meet the market demand of an integrated timber industry is an irrelevant question.  Plaintiffs could have alleged that the Strategy prevents the Forest Service from seeking to meet its actual projection of market demand.  But they did not.  And the Court will not rewrite plaintiffs' complaint and briefs to assert the proper claim.  Plaintiffs' contention that the Timber Sale Adaptive Management Strategy violates the TTRA therefore fails at the outset.

---

[9] In their litigation papers, plaintiffs similarly, and consistently, contend that the 2008 TLMP Amendment prevents the Forest Service from seeking to meet market demand for an integrated timber industry.  See, e.g., Pls.' Mem. at 29 ("[T]he Forest Service will not be able to seek to meet market demand, which it has identified as an annual minimum of 200 [million board feet] to reestablish an integrated industry."); id. at 30 ("Thus, [the Timber Sale Adaptive Management Strategy] will always be stuck in Phase 1 at 100 [million board feet], notwithstanding the 2008 TLMP Amendment's recognition that a minimum of 200 [million board feet] per year is needed to seek to meet the market demand for an integrated industry."); id. at 33 (the Timber Sale Adaptive Management Strategy provides "only half of the volume the Regional Forester has determined is needed to seek to meet market demand for an integrated industry"); id. at 34 (the Timber Sale Adaptive Management Strategy is flawed because the 2008 TLMP Amendment "acknowledges that the industry needs a minimum of 200 [million board feet] per year to reestablish a fully integrated industry"); id. at 44-45 (the Forest Service cannot "supply the volume of timber that they have identified is needed to meet market demand for an integrated timber industry").

To be sure, in a supplemental memorandum filed at the Court's request, plaintiffs do suggest that the 2008 TLMP Amendment and its Timber Sale Adaptive Management Strategy preclude the Forest Service from meeting its own projection of market demand.  See Pls.' Responses to the Court's January 21, 2010 Questions ("Pls.' Resp.") [Docket Entry 30], at 9-10. This single allegation, however, is insufficient to rescue plaintiffs' claims under the TTRA.  First, as discussed above, their complaint is devoid of any assertion that the Timber Sale Adaptive Management Strategy prevents the Forest Service from seeking to meet its actual projection of market demand.  Plaintiffs' post hoc answer in a supplemental brief does not change how they have consistently litigated this case.

Second, even assuming plaintiffs properly presented a challenge to the Forest Service's projection of market demand, they have not provided sufficient evidence to overcome the "extreme degree of deference" given to an agency's evaluation of "scientific data within its technical expertise."  Am. Farm Bureau Fed'n, 559 F.3d at 519.  The Forest Service concluded that the 2008 TLMP Amendment and its Timber Sale Adaptive Management Strategy, "allows the projected level of long-term demand to be met."  2008 TLMP Amendment ROD at 35. Plaintiffs, however, suggest that "[t]he failure to provide a sufficient volume of economic timber in the 2008 [TLMP Amendment's] 5 year timber sale schedule" renders the Forest Service unable to meet its own projection of market demand.  Pls.' Resp. at 10.  And they further contend that there is an insufficient amount of timber that either is available for sale or has been sold but not yet harvested to permit the Forest Service to meet its projection of market demand.  See id. at 9.

But plaintiffs' argument ignores the fact that "[t]he Forest Service employs a 'pipeline' approach to timber sale planning to provide a stable timber sale program and a continuous flow

of timber to regional processors." 2008 TLMP Amendment FEIS at 3-334. That is, the Forest

Service seeks to meet market demand through a mix of timber available for sale, timber sold but

not yet harvested, and timber that is being planned for sale. See id. On the basis of this pipeline,

the Forest Service concluded that the 2008 TLMP Amendment would permit it to meet its actual

projections of market demand. See 2008 TLMP Amendment ROD at 35.

Although the Court recognizes that the Forest Service and plaintiffs disagree on this

point, the Court cannot say that the Forest Service's conclusion is incorrect. Plaintiffs have not

provided the necessary evidence to overcome "'the considerable deference to an agency's

expertise'" where "a 'highly technical question' is involved." Am. Radio Relay League, Inc., 524

F.3d at 233 (quoting MCI Cellular Tel. Co., 738 F.2d at 1333). They have not, for example,

shown that the Forest Service will not be able to meet market demand for each year the 2008

TLMP Amendment is in effect. In fact, they concede that even without any further timber sales,

there is enough timber in the "pipeline" to meet market demand through 2012. See Pls.' Resp. at

9. Furthermore, plaintiffs' position does not take into account timber sales conducted under the

Timber Sale Adaptive Management Strategy, which will likely increase the amount of timber in

the pipeline. See Defs.' Responses to the Court's January 21, 2010 Questions [Docket Entry 31],

at 2. The Court simply cannot conclude, in the absence of any evidence marshaled by plaintiffs,

that the 2008 TLMP Amendment will not meet the Forest Service's projection of market demand.

Nor can plaintiffs save their cause by pointing to the fact that in the 2008 TLMP

Amendment the Forest Service recognized the importance of "provid[ing] an opportunity for the

timber industry to become more integrated." 2008 TLMP Amendment ROD at 36. In the Plan,

the Forest Service concluded that the 2008 TLMP Amendment should be flexible enough to

provide sufficient timber to create an integrated industry.  See id. at 36-37.  Relying on the

Pacific Northwest Research Station's study, the Forest Service found that "a reliable annual

supply of at least 200 million board feet of economic timber would be needed from the Tongass

to meet the objective of providing an opportunity for the reestablishment of an integrated

industry."  Id. at 37.  It therefore set the allowable sale quantity of timber at 267 million board

feet annually to provide that opportunity.  This decision merely builds flexibility into the 2008

TLMP Amendment such that the forest plan could, in the Forest Service's expert view,

potentially meet the market demand associated with any integrated industry that develops.  It

does not, however, alter the Forest Service's projections of market demand.  And therefore it has

no effect on the Forest Service's obligation under the TTRA to seek to meet the actual market

demand projection.

## V.

Finally, plaintiffs also suggest that the 2008 TLMP Amendment imposes "non-statutory"

constraints on the Forest Service's seek-to-meet obligation -- limitations, plaintiffs opine, that

preclude the Forest Service from fulfilling its obligations under the TTRA.  As the Court

discussed in Part IV, however, plaintiffs do not contend in their complaint or in their briefing that

the 2008 TLMP Amendment will preclude the Forest Service from seeking to meet its actual

projection of market demand.  Hence, they present no allegation or argument that the "non-

statutory" constraints specifically limit the Forest Service's ability to seek to meet market

demand.  Rather, plaintiffs specifically cast their "non-statutory" constraints argument, as they do

their challenge to the Timber Sale Adaptive Management Strategy, in terms of the market

demand for an integrated timber industry.  See, e.g., Pls.' Reply at 36, 40, 41.  Plaintiffs' "non-statutory" constraints argument therefore also fails at the threshold.[10]

**VI.**

For the foregoing reasons, defendants' motion for summary judgment will be granted, and plaintiffs' motion for summary judgment will be denied.  A separate order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: February 17, 2010

---

[10] Plaintiffs would fare no better even if the Court reached the merits of their challenge. Although plaintiffs' assert in their supplemental response that the 2008 TLMP Amendment and its Timber Sale Adaptive Management Strategy preclude the Forest Service from seeking to meet its actual projection of market demand, see Pls.' Resp. at 9-10, the Court has already concluded that the response does not provide sufficient evidence to overcome the "considerable deference" given to agency evaluations of "scientific data within its technical expertise," see Am. Farm Bureau, 559 F.3d at 512; see also Part IV, supra.  That conclusion applies with equal force to plaintiffs' "non-statutory" constraints argument.